*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DELANO SHAUNTEZ BROWN-RAGLAND,

Defendant-Appellant.

UNPUBLISHED
July 25, 2024

No. 367443
Wayne Circuit Court
LC No. 21-008866-01-FC

Before: LETICA, P.J., and BOONSTRA and MARIANI, JJ.

PER CURIAM.

Defendant appeals by right his jury-trial convictions of second-degree murder, MCL 750.317; felon in possession of a firearm (felon-in-possession), MCL 750.224f; fourth-degree arson, MCL 750.75(1); and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b.[1] The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to concurrent terms of 50 to 100 years' imprisonment for second-degree murder, 6 to 20 years' imprisonment for felon-in-possession, and 6 to 20 years' imprisonment for fourth-degree arson, to be served consecutively to a term of two years' imprisonment for felony-firearm. On appeal, defendant challenges his sentence for second-degree murder, arguing that the sentence imposed was disproportionate and unreasonable. We affirm defendant's sentence but remand to the trial court for the ministerial tasks of correcting any errors in the presentence investigation report (PSIR) that were addressed at sentencing and for the correction of various errors in the judgment of sentence and the order of conviction and sentence.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Shortly after 2:00 a.m. on March 22, 2021, defendant fatally shot the victim in the front yard of his then-girlfriend's house. Defendant's ex-girlfriend, who had been the victim's long-

---

[1] Defendant was convicted of felony-firearm as it related to his felon-in-possession conviction; he was acquitted of felony-firearm as it related to his second-degree murder conviction, and was never charged with felony-firearm as it related to his fourth-degree arson conviction.

time friend, testified that she and the victim argued about their friendship via text messages and phone calls throughout the evening of March 21, 2021. The argument came to a head and, based on a phone call with the victim, defendant's ex-girlfriend expected the victim to come to her house to physically confront her. She then told defendant, who was at her home that night, about the victim's threats to come to her house, and the two waited for the victim to arrive. Defendant's ex-girlfriend had two registered 9-millimeter (mm) handguns in one of her closets at that time, and based on previous discussions, defendant was aware of their location.

Defendant's ex-girlfriend further testified that the victim arrived at her house at approximately 2:00 a.m. After parking her red SUV in the driveway, the victim walked to the front of the house, "started banging on the [front] door," and yelled at defendant's ex-girlfriend to "come on outside." Defendant's ex-girlfriend was hesitant to answer the door and, as she contemplated what to do, defendant walked toward an exterior door in the kitchen that opened onto the driveway on the side of the house. The victim had backed away from the front porch but continued to yell from the front lawn, so defendant's ex-girlfriend walked out onto her front porch, and the two had a verbal confrontation from across the yard. Shortly thereafter, the victim ran up to the front porch, pulled out a handgun, "cocked it back," and pointed it at defendant's ex-girlfriend. As this occurred, defendant's ex-girlfriend saw defendant exit the side of her house and, within seconds, heard two or three gunshots.

Defendant's ex-girlfriend testified that she immediately ran back into her house to check on her children and that, once inside, she heard "a second burst of shots." The gunshots stopped, and she heard defendant call out to her from the front of the house, asking her where her car keys were. She looked out the window a few moments later and saw the victim's car pulling out of her driveway, so she called defendant on the phone to inform him that the victim had left. Defendant clarified, however, that he—not the victim—had left in the victim's car and that the victim was "laying in the front." Defendant's ex-girlfriend subsequently discovered the victim lying on her front lawn and called the police. As she waited for the police to arrive, defendant called her and told her that he had gotten rid of the guns and burned the victim's car. Defendant also instructed her to delete any recorded video footage of that night from her doorbell video camera because he "didn't want evidence that he was there" that night.

A neighbor of the defendant's ex-girlfriend, who lived directly across the street from her, testified that he called the police to report a shooting that occurred shortly after 2:00 a.m. on March 22, 2021. The man testified that he heard two gunshots, which prompted him to look out of his bedroom window. Following a pause of less than 10 seconds, he heard three to five more gunshots. He saw a "muzzle flash" accompany each shot, allowing him to see the silhouette of an individual "standing over a person on the front lawn shooting down." According to the neighbor, the shooter then repeatedly went "in and out of the house and up and down the driveway" and appeared as if "they were trying to get rid of something" or "hide something." The shooter then got into a red SUV parked in the driveway and drove off.

A medical examiner testified that an autopsy of the victim revealed that she had sustained a total of eight gunshot wounds to her left cheek, back, arm, buttock, hip, and thigh. Four 9-mm bullets were recovered from the victim's body. The detective investigating the shooting testified that, upon arriving at the scene of the crime, he saw the victim lying on the front lawn. A .380 Smith & Wesson firearm was on the ground just to the left of her body, and there were "numerous

[9-mm] shell casings" on the ground nearby. An investigating officer testified that she recovered 12 9-mm shell casings from the front yard and driveway. The detective testified that the shell casings came from a 9-mm semi-automatic pistol rather than the gun found next to the victim because a .380-caliber gun cannot fire 9-mm bullets. Upon searching inside of the house, the detective found an empty gun holster, a box of 9-mm ammunition, and a disconnected doorbell camera in the living room, and the investigating officer testified that she located two empty gun boxes for 9-mm handguns registered to defendant's ex-girlfriend. Neither of them located any firearms during the search.

Another officer testified that, several hours after the shooting, he was dispatched to an abandoned school in the area to investigate an arson. Upon his arrival, he saw that a red SUV, which he later determined was registered to the victim, had "burnt to a crisp" in the parking lot. The detective from the fire department who investigated the arson testified that, based on his internal and external examinations of the SUV, the fire was set intentionally.

Defendant testified on his own behalf, focusing on the core theory of his defense: that he shot the victim in self-defense and the defense of his ex-girlfriend. Defendant stated that, when the victim arrived, his ex-girlfriend went outside to confront her and immediately faced a loaded gun, so he ran to the bedroom and retrieved his ex-girlfriend's 9-mm handguns from a lockbox in the closet. Defendant then circled around to the front of the house through the exterior side door and came within five feet of the victim. According to defendant, the victim, upon seeing him, stopped pointing the gun at his ex-girlfriend and began pointing the gun at him instead. Defendant stated that he then shot the victim because he "feared for [his] life." Defendant stated that he "fired a couple shots," but it appeared that the victim was still trying to aim her gun at him, so he "fired more shots" at her. Defendant testified that the victim was standing both times that he shot at her and that he never stood over her while shooting. Defendant ran into the house and told his ex-girlfriend that he had to leave, then ran back outside, got in the victim's car, and drove off. Defendant testified that he "panicked" and "[did not] really know what to do," so he drove the victim's red SUV to an abandoned school, where he disposed of his ex-girlfriend's guns and lit the victim's SUV on fire.

The jury convicted defendant of the offenses noted previously. At sentencing, pursuant to the parties' requests, the trial court corrected several factual and scoring errors in the PSIR. The trial court also noted that the PSIR—which indicated that the recommended minimum sentencing guidelines range for defendant's second-degree murder conviction was a term of 315 to 525 months' imprisonment, or life—did not account for defendant's status as a fourth-offense habitual offender as listed in his felony information. The trial court further noted that, based on his habitual-offender status and corrected scoring errors, defendant's proper minimum sentencing guidelines range was actually a term of 315 to 1,050 months' imprisonment, or life. Both defendant and his trial counsel affirmatively agreed that the court's calculations were accurate. After all of the necessary corrections had been made, the trial court sentenced defendant to a term of 50 to 100 years' imprisonment for second-degree murder. This appeal followed.

## II. DISCUSSION

On appeal, defendant challenges the sentence for his second-degree murder conviction, arguing that a term of 50 to 100 years' imprisonment was an unreasonable and disproportionate

sentence. Specifically, defendant argues that the trial court abused its discretion by imposing a departure sentence that was 75 months above his recommended minimum sentencing guidelines range of 315 to 525 months' imprisonment without articulating any substantial and compelling reasons for doing so.[2] It is clear from the record, however, that the trial court did not impose a departure sentence. The PSIR failed to account for defendant's status as a fourth-offense habitual offender and therefore incorrectly reflected the recommended minimum sentencing guidelines range as 315 to 525 months' imprisonment, or life. This error was expressly addressed and corrected by the trial court at sentencing, and the parties agreed that, when accounting for defendant's habitual-offender status, the proper minimum sentencing guidelines range was 315 to 1,050 months' imprisonment, or life.[3] Thus, defendant's minimum sentence of 50 years' (600 months') imprisonment was well within the proper sentencing guidelines range.

Although defendant received a within-guidelines sentence, his sentence is reviewed for reasonableness. See *People v Posey*, 512 Mich 317, 359-360; 1 NW3d 101 (2023). "[T]he proper inquiry when reviewing a sentence for reasonableness is whether the trial court abused its discretion by violating the 'principle of proportionality' set forth in *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990), 'which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender.' " *People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017). A proportionate sentence generally considers "the reformation of the offender, the protection of society, the discipline of the offender, and the deterrence of others from committing the same offense." *People v Boykin*, 510 Mich 171, 183; 987 NW2d 58 (2022). Other relevant factors to be considered include:

> (1) the seriousness of the offense; (2) factors that were inadequately considered by the guidelines; and (3) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, the defendant's misconduct while in custody, the defendant's expressions of remorse, and the defendant's potential for rehabilitation. [*People v Walden*, 319 Mich App 344, 352-353; 901 NW2d 142 (2017) (quotation marks and citation omitted).]

---

[2] Defendant mistakenly identifies the "substantial and compelling reason" standard as still governing departure sentences. See *People v Lockridge*, 498 Mich 358, 391; 870 NW2d 502 (2015) (explicitly "strik[ing] down the requirement of a 'substantial and compelling reason' to depart from the guidelines range in MCL 769.34(3)"). As discussed *infra*, however, the trial court in this case did not impose a departure sentence, so this mistake is ultimately inconsequential.

[3] Second-degree murder is a Class M2 offense. MCL 777.16p. Defendant's prior record variable (PRV) level is level E, and his offense variable (OV) level is level III, which corresponds to a recommended minimum sentencing guidelines range of 315 to 525 months' imprisonment. MCL 777.61. Defendant's status as a fourth-offense habitual offender, however, increases the upper limit of the range by 100 percent, MCL 777.21(3)(c), thereby changing his minimum sentencing guidelines range from 315 to 525 months' imprisonment to 315 to 1,050 months' imprisonment.

A within-guidelines sentence is presumptively proportionate, and "the defendant bears the burden of demonstrating that their within-guidelines sentence is unreasonable or disproportionate." *Posey*, 512 Mich at 359.

Applying these standards to this case, we conclude that defendant has not overcome the presumption that his within-guidelines sentence is reasonable and proportionate. As previously mentioned, the proper recommended minimum sentencing guidelines range for defendant's second-degree murder conviction was 315 to 1,050 months' imprisonment, or life, and the trial court sentenced defendant to a minimum term of 600 months' imprisonment. In arguing that his sentence was unreasonable and disproportionate, defendant principally argues that his own circumstances—namely, his age and the nonviolent nature of his prior convictions—mitigate in favor of a lesser sentence. Specifically, defendant argues that none of his prior convictions "involved a violent offense, or for that matter, any interaction with a person" and that he "was 33 years old at the time of sentencing" and "will be around 82 years old before he is eligible for parole." The fact that defendant was 33 years old at the time of the shooting, however, is insufficient to overcome the presumption of proportionality. See *People v Bowling*, 299 Mich App 552, 558-559; 830 NW2d 800 (2013) (holding that the defendant's age was insufficient to overcome the presumption of a proportionate sentence despite the fact that the defendant had been sentenced, as a fourth-offense habitual offender, to a 100-year minimum sentence for his second-degree murder conviction). Nor is the fact that all nine of defendant's prior felony convictions were nonviolent offenses. See MCL 777.21(3)(c) (increasing the upper end of a defendant's minimum sentencing guidelines range by 100 percent when he or she is "sentenced for a fourth or subsequent felony" regardless of whether the felonies are violent or nonviolent); MCL 777.51 through MCL 777.56 (providing scoring guidelines to specifically account for the severity of a defendant's prior felony and misdemeanor convictions).

We believe this to be particularly true in this case given the circumstances surrounding the sentencing offense. As reflected by the PSIR and recognized by the trial court at sentencing, defendant, while standing only five feet away, shot the victim several times, paused for several seconds, then shot the victim several more times while she lay on the ground. Defendant ultimately shot the victim eight times, killing her. Defendant then instructed his ex-girlfriend to delete all recorded video footage of him from her doorbell camera to eliminate any evidence of his presence at her house during the shooting, disposed of the firearm used in the shooting, and set the victim's car on fire in an abandoned school parking lot. And, as duly noted by the trial court, the jury rejected defendant's claims of self-defense and defense of others and convicted defendant of second-degree murder based on this evidence presented at trial. It is clear from the record that the sentencing judge, who also presided over defendant's trial and was therefore keenly aware of all of the evidence presented at trial, thoroughly considered the circumstances surrounding the offense and the offender, and defendant has failed to point to anything in the record to sufficiently rebut the presumption of proportionality. See *Posey*, 512 Mich at 359-360. Accordingly, we cannot conclude that the trial court's decision to impose a minimum sentence falling within the lower half of the recommended guidelines range for defendant's second-degree murder conviction was an abuse of discretion. See *id*.

Despite this conclusion, we must remand to the trial court for the correction of several errors contained in the PSIR, the judgment of sentence, and the order of conviction and sentence. At sentencing, the parties and the trial court agreed to certain changes to the scoring of the PRVs

and the OVs, but those changes are not reflected in the copy of the sentencing information report (SIR) appended to the PSIR.[4] The PSIR also does not reflect defendant's fourth-offense habitual offender status or the increased sentencing guidelines range that resulted, both of which were thoroughly discussed and agreed upon by the parties and the trial court at sentencing. Additionally, while the judgment of sentence indicates that defendant was convicted by a jury and references his habitual-offender status immediately after citation of the substantive offenses for which he was convicted, the trial court's order of conviction and sentence issued with the judgment of sentence does not reference defendant's habitual-offender status at all and incorrectly indicates that defendant was convicted by guilty plea rather than a jury. It is undisputed that defendant was convicted by a jury and subsequently sentenced as a fourth-offense habitual offender.

Finally, the judgment of sentence and the order of conviction and sentence incorrectly reflect that defendant's felony-firearm sentence is to be served preceding and consecutive to defendant's sentences for felon-in-possession, second-degree murder, and fourth-degree arson. Because defendant's felony-firearm conviction was predicated only on his felon-in-possession conviction, the judgment of sentence and the order of conviction and sentence must be amended to reflect that defendant's felony-firearm sentence is to be served consecutive only to his felon-in-possession sentence and concurrent with his convictions for second-degree murder and fourth-degree arson. See *People v Clark*, 463 Mich 459, 463; 619 NW2d 538 (2000) ("From the plain language of the felony-firearm statute, [MCL 750.227b,] it is evident that the Legislature intended that a felony-firearm sentence be consecutive only to the sentence for a specific underlying felony."); *People v Coleman*, 327 Mich App 430, 441; 937 NW2d 372 (2019) ("A felony-firearm sentence must therefore be served consecutively with the sentence for the one predicate felony."). On remand, the trial court should correct these errors. See MCR 7.216(A)(7).

## III. CONCLUSION

Affirmed, but remanded for the correction of defendant's PSIR, the judgment of sentence, and the order of conviction and sentence consistent with this opinion. We do not retain jurisdiction.

/s/ Anica Letica
/s/ Mark T. Boonstra
/s/ Philip P. Mariani

---

[4] Specifically, the score for OV 3, MCL 777.33 (physical injury to victim), was reduced from 50 points to 25 points; the score for OV 17, MCL 777.47 (degree of negligence exhibited), was reduced from 10 points to zero points; the score for OV 19, MCL 777.49 (interference with administration of justice), was increased from zero points to 10 points; and the score for PRV 6, MCL 777.56 (relationship to criminal justice system), was reduced from 15 points to 10 points. Pursuant to defendant's request, the trial court also corrected a factual error contained in the PSIR, which incorrectly indicated that defendant only had one child instead of three.